UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PARK NATIONAL BANK, <br><br> Defendant. | CASE NO.: <br><br><br> COMPLAINT OF THE UNITED STATES OF AMERICA <br><br> JURY TRIAL DEMANDED |

For its Complaint, the United States of America alleges as follows:

1. The United States of America (the "United States") brings this action against Park National Bank ("PNB" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, to remedy discrimination in PNB's residential mortgage lending.

2. The FHA and ECOA prohibit creditors, including banks, from discriminating in home loans and other residential credit transactions on the basis of race, color, national origin, and other characteristics.

3. "Redlining" is prohibited under the FHA and ECOA. Redlining occurs when lenders discourage applications, deny equal access to home loans and other credit services, or avoid providing home loans and other credit services in neighborhoods based on the race, color, or national origin of their residents.

4. From 2015 through at least 2021 (the "Relevant Time Period"), PNB engaged in a pattern or practice of unlawful redlining. As alleged in detail herein, PNB avoided providing

1

home loans[1] and other mortgage services in majority-Black and Hispanic neighborhoods within the Columbus, Ohio Metropolitan Statistical Area ("Columbus MSA" or the "MSA").[2]

5. Over the course of the Relevant Time Period, PNB operated a total of 36 branch locations in the Columbus MSA. None of PNB's branches were located in a majority-Black and Hispanic area, even though nearly 17 percent of the census tracts in the MSA are majority-Black and Hispanic. The Bank failed to compensate for its lack of locations in majority-Black and Hispanic neighborhoods through marketing and outreach to residents of these areas, and instead relied on its retail branch network, mortgage lenders based in majority-white neighborhoods, and internal client referrals to generate home loan applications.

6. Further, during the Relevant Time Period, PNB's internal fair lending oversight, policies, and procedures were inadequate to ensure that the Bank provided equal access to credit to residents of majority-Black and Hispanic neighborhoods, and PNB failed to take effective action in response to information indicating that it was underserving residents of majority-Black and Hispanic areas.

7. As a result of the above-described practices, PNB generated disproportionately low numbers of loan applications and home loans from majority-Black and Hispanic neighborhoods in the Columbus MSA in each year of the Relevant Time Period, as compared to

---

[1] For purposes of this Complaint, the terms "home loans" and "mortgage loans" refer to all loans that PNB and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2810, and "mortgage lending" refers to providing those loans.

[2] A "majority-Black and Hispanic" census tract is a residential census tract where more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau. This Complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "majority-white census tract," "majority-white area," and "majority-white neighborhood."

its peer lenders.

8. PNB's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans to those residing in, or seeking credit for properties located in, majority-Black and Hispanic neighborhoods, and otherwise discouraged these individuals from applying for mortgage loans. The Bank's conduct was not justified by a legitimate, nondiscriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1345, 42 U.S.C. § 3614(a), and 15 U.S.C. § 1691e(h) because the action arises under the laws of the United States, and the United States brings this case as a plaintiff.

10. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

11. Plaintiff the United States brings this action to enforce the provisions of the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance. 42 U.S.C. § 3614(a).

12. Defendant Park National Bank is a multi-state bank headquartered in Newark, Ohio that offers commercial, consumer, mortgage, and wealth management banking services.

PNB is the sole banking subsidiary of Park National Corporation, a holding company.

13. Chartered in 1908 as The Park National Bank of Newark, Ohio, PNB now operates in four states—Ohio, Kentucky, North Carolina, and South Carolina. PNB has a total of 92 full-service branches, 20 of which are in the Columbus MSA.

14. The Columbus MSA is PNB's most active metropolitan market for home loans. From 2015 through 2020, PNB consistently ranked in the top eleven lenders in the MSA based on mortgage loan application volume.

15. PNB is subject to the regulatory authority of the Office of the Comptroller of the Currency and has total assets of $9.8 billion.

16. PNB is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100 and 12 C.F.R. pt. 1002.

17. PNB is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### A. The Columbus MSA and PNB's Assessment Areas

18. The Columbus MSA is comprised of ten counties in Ohio: Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union. Columbus, the most populous city in the MSA, is located in Franklin County.

19. The Columbus MSA has a population of more than two million. The MSA's residents are 75 percent white, 15 percent Black, four percent Hispanic or Latino, and four percent Asian. There are 433 census tracts in the Columbus MSA, 73 of which are majority-Black and Hispanic. All the majority-Black and Hispanic census tracts in the MSA are in Franklin County.

20. As a depository bank, PNB is subject to the requirements of the Community

Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, and its enabling regulations, which require most banks to meet the credit needs of the communities that they serve. Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment areas." Federal regulators look at a bank's assessment areas in evaluating whether an institution is meeting the credit needs of its entire community.

21. PNB has two self-designated assessment areas within the Columbus MSA. Between 2015 and 2020, one of these assessment areas was comprised of Fairfield, Franklin, Hocking, Licking, Madison, and Perry Counties, and the other consisted only of Morrow County. These seven counties are collectively referred to herein as the "Columbus Lending Area."[3]

22. There are 375 census tracts in the Columbus Lending Area, which includes all 73 of the majority-Black and Hispanic census tracts in the Columbus MSA. Accordingly, the United States claims and allegations in this Complaint focus on the Columbus Lending Area.

**B. None of PNB's Branches in the Columbus Lending Area Were Located in a Majority-Black and Hispanic Neighborhood**

23. Over the course of the Relevant Time Period, PNB operated between 20 and 32 branches—36 unique locations in total where it accepted home loan applications—in the Columbus Lending Area.[4] Although 19 percent of the census tracts in the Columbus Lending Area are majority-Black and Hispanic, the Bank did not maintain any of its branches in majority-Black and Hispanic neighborhoods. *See* **Exhibits A** and **B** (depicting PNB's branches in the Columbus Lending Area and Franklin County from 2015 to 2021).

---

[3] The Bank removed Madison County from the first assessment area in 2020, but did not otherwise modify its assessment areas within the Columbus MSA during the Relevant Time Period.

[4] All of PNB's branches in the Columbus MSA were located in the Columbus Lending Area.

24. Throughout the Relevant Time Period, all PNB's branches in the Columbus Lending Area were located in majority-white census tracts.

25. Between 2015 and 2020, the Bank relocated, consolidated, or closed many of its branches in the Columbus Lending Area. Of the four branches it relocated, PNB did not move any to a majority-Black and Hispanic neighborhood.

26. PNB's branches are concentrated in Licking County, where it operated between nine and 15 office locations during the Relevant Time Period. The Bank only maintained between three and five branches in Franklin County, which includes the largest city and all the majority-Black and Hispanic census tracts in the Columbus Lending Area. Within Franklin County, only three of the Bank's branches were located in census tracts that share a border with a majority-Black and Hispanic census tract. *See* **Exhibit B**. Across the Relevant Time Period, no more than two of these branches were ever simultaneously in operation.

27. PNB knew that its lack of branches in majority-minority[5] areas presented fair lending risks. Nevertheless, throughout the Relevant Time Period, the Bank failed to open or maintain a branch in a majority-minority census tract in the Columbus Lending Area.

28. By placing all its branches in majority-white census tracts—few of which are proximate to majority-Black and Hispanic neighborhoods—PNB discouraged residents of, or those seeking credit for properties located in, majority-Black and Hispanic areas from applying for and obtaining home loans and restricted their access to the Bank's credit and mortgage lending services.

---

[5] "Majority-minority" is a term of art generally used in the redlining context to refer to census tracts where the majority (over 50 percent) of residents are people of color. Most, but not all, of the majority-minority census tracts in the Columbus Lending Area are majority-Black and Hispanic census tracts.

### C. The Bank Relied on its Branch Network, Mortgage Lenders Concentrated in Majority-White Neighborhoods, and Internal Referrals to Originate Home Loans in the Columbus Lending Area

29. Between 2015 and 2020, PNB's business model, as described in its Mortgage Banking and Real Estate Loan Policy ("Mortgage Banking Policy"), was to originate mortgage loans by leveraging its retail branch network utilizing mortgage lenders[6] as well as client referrals from other areas within the Bank.

30. During the Relevant Time Period, PNB's retail branch network did not extend to majority-Black and Hispanic neighborhoods in the Columbus Lending Area, and the Bank did not assign its mortgage lenders to service or otherwise work in particular geographic areas beyond their office locations, all of which were in majority-white census tracts.

31. Moreover, PNB's mortgage lenders were concentrated in its branches outside of Franklin County. Between 2015 and 2021, as many as 18 mortgage lenders worked out of PNB's main offices in Licking County, and up to 17 were assigned to its primary location in Fairfield County. Meanwhile, no more than 10 mortgage lenders were assigned to PNB's branches across Franklin County at any point in time.

32. Because PNB's branches and staff were based in majority-white neighborhoods—most of which are not adjacent to majority-Black and Hispanic census tracts—its services were more easily available to residents of these areas than to residents of majority-Black and Hispanic neighborhoods. Accordingly, residents of majority-white census tracts were more likely to have a preexisting relationship with the Bank—and benefit from an internal client referral—than residents of majority-Black and Hispanic areas.

---

[6] This Complaint uses "mortgage lenders" to refer to all PNB employees who solicited mortgage loans as part of their core job responsibilities.

33. The adoption of the Mortgage Banking Policy was intentional and willful, and structured PNB's lending operations to serve the credit needs of residents of majority-white neighborhoods, but not the credit needs of residents of majority-Black and Hispanic census tracts in the Columbus Lending Area. In 2021, PNB revised the Policy to state that the Bank "originates residential mortgage loans by *leveraging the communities that [it] serve[s]* and residential mortgage loan originators (MLO)." (emphasis added)

### D. PNB Engaged in Limited Marketing and Outreach to Residents of Majority-Black and Hispanic Census Tracts in the Columbus Lending Area

34. PNB failed to take adequate steps to mitigate against the foreseeable consequences of its branch locations and business model, which operated to deprive residents of majority-Black and Hispanic areas of access to its mortgage lending services.

35. PNB did not make an online mortgage loan application available to its potential clients throughout the Relevant Time Period. The Bank piloted an online application process in 2019, and did not revise its Mortgage Banking Policy to allow for online completion of home loan applications until 2020. Even so, the Policy continued to specify that "any submission of written applicant data . . . does not constitute a formal written application until such time that [a PNB employee] has contacted the applicant in person, in writing, or by telephone."

36. PNB also engaged in limited advertising of its mortgage loan products in the Columbus MSA, little of which was directed to majority-Black and Hispanic audiences. The Bank's internal fair lending assessment of its marketing in 2015 warned that PNB's applicant pool was not reflective of the demographics of its market area and rated its risk of excluding areas with high percentages of minority residents through its marketing as "very high." Although PNB advertised in a few outlets with predominantly Black readers and listeners over the course of the Relevant Time Period, the Bank failed to make a concerted effort to target its marketing of its

mortgage loan products to minority borrowers or areas in response to this assessment.

37. Moreover, in 2016, PNB's Compliance Department raised concerns that proposed marketing materials for one of the Bank's lines of business could "discourage" potential customers from reaching out to PNB. As the Compliance Department explained, in relevant part: "[T]he bank operates in 9 counties within the State of Ohio that have major[ity-]minority census tracts, mostly populated by African-Americans. . . . If the bank doesn't display diversity in its advertising, how is the bank to reflect that we offer our products/services to all equally . . . ?"

38. Despite this feedback from the Compliance Department, in the years that followed, some of the Bank's marketing materials in the Columbus MSA featured only images of PNB's white mortgage lenders. All but one of the 101 mortgage lenders PNB employed in the MSA over the course of the Relevant Time Period were white.

39. During the Relevant Time Period, PNB's outreach efforts in majority-Black and Hispanic areas primarily consisted of activities such as sponsoring events and making financial contributions to local organizations that were not specifically designed to develop mortgage loan applications from these neighborhoods. Although PNB provided a variety of financial literacy courses, including homebuyer education programs, through local schools and other organizations, few were offered in majority-Black and Hispanic areas. Between 2013 and 2020, PNB hosted over 70 such classes through "non-school organizations" in the Columbus MSA, only five of which were in majority-Black and Hispanic census tracts. During this time period, none of PNB's financial literacy programs were held at local schools in majority-Black and Hispanic census tracts in the Columbus MSA.

40. PNB also failed to take steps to make its services available to persons with limited English proficiency. The Bank did not engage in any Spanish-language marketing, even though

over 45,000 residents of Franklin County speak Spanish at home. Additionally, PNB lacked sufficient Spanish-speaking mortgage lenders to adequately provide credit services to Spanish-speaking applicants and prospective applicants in the Columbus Lending Area.

### E. PNB's Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods in the Columbus Lending Area

41. PNB's actions and lending policies and practices alleged herein have discouraged applicants in majority-Black and Hispanic census tracts in the Columbus Lending Area from applying for and obtaining home loans and other mortgage-related services.

42. PNB's publicly available HMDA data on its loan applications and originations confirms that PNB avoided serving majority-Black and Hispanic neighborhoods in the Columbus Lending Area. *See* **Exhibit C** (depicting PNB's applications from majority-Black and Hispanic census tracts in the Columbus Lending Area from 2015 to 2021).

43. During the Relevant Time Period, PNB significantly underperformed its "peer lenders" in generating home loan applications[7] from majority-Black and Hispanic census tracts in the Columbus Lending Area. "Peer lenders" are financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home loan applications.

44. The disparity between the rates of applications generated by PNB and its peer lenders from majority-Black and Hispanic areas is statistically significant—meaning unlikely to be caused by chance—and sizeable in every year included in the Relevant Time Period.

45. During the Relevant Time Period, PNB received a total of 13,437 HMDA-reportable mortgage loan applications within the Columbus Lending Area. Of these applications,

---

[7] In this section, the terms "home loan applications," "mortgage loan applications," and "HMDA applications" are used interchangeably to refer to mortgage loan applications for 1-4 family, owner-occupied properties.

only 159, or 1.2 percent, came from individuals seeking credit for properties located in majority-Black and Hispanic census tracts.  By contrast, over the same time period, PNB's peers generated 8.6 percent of their HMDA applications from majority-Black and Hispanic census tracts in the Columbus Lending Area.

46. In other words, across the Relevant Time Period, PNB's peer lenders generated applications from majority-Black and Hispanic neighborhoods at over seven times the rate of PNB.  In each year of the Relevant Time Period, PNB's peers received applications from these areas at a rate at least five times and up to over ten times the rate of PNB.

47. The statistically significant disparities between applications PNB generated from majority-Black and Hispanic census tracts and those that its peers generated show that there were a substantial number of residents in majority-Black and Hispanic neighborhoods in the Columbus Lending Area who were seeking and applying for home loans.  PNB had no legitimate, non-discriminatory reason to draw so few applications from these areas.

48. The data demonstrates a statistically significant failure by PNB, relative to its peer lenders, to generate applications for home loans and provide residential mortgage services to residents of, and those seeking credit for properties located in, majority-Black and Hispanic census tracts in the Columbus Lending Area on a non-discriminatory basis during the Relevant Time Period.

  **F. PNB's Disproportionately Low Numbers of Home Loan Originations in Majority-Black and Hispanic Neighborhoods in the Columbus Lending Area**

49. PNB's lending practices have discouraged prospective applicants in majority-Black and Hispanic neighborhoods in the Columbus Lending Area from seeking home loans.  As

a result, the Bank made a smaller percentage of HMDA-reportable mortgage loans[8] in these areas compared to its peers during the Relevant Time Period. *See* **Exhibit D** (depicting PNB's loan originations in majority-Black and Hispanic census tracts in the Columbus Lending Area from 2015 to 2021).

50. The disparity between the rates of home loans made by PNB and its peer lenders in majority-Black and Hispanic areas is statistically significant and sizeable in every year included in the Relevant Time Period.

51. During the Relevant Time Period, PNB made a total of 9,602 HMDA-reportable residential mortgage loans in the Columbus Lending Area. Of these loans, only 88, or .92 percent, were made to residents of majority-Black and Hispanic census tracts. By contrast, during the same time period, PNB's peers made 6.98 percent of their HMDA loans to residents of majority-Black and Hispanic census tracts in the Columbus Lending Area.

52. In other words, across the Relevant Time Period, PNB's peer lenders made these loans in majority-Black and Hispanic neighborhoods at over seven times the rate of PNB. In each year of the Relevant Time Period, PNB's peers made loans in majority-Black and Hispanic areas at a rate at least 4.5 times and up to 12.5 times the rate of PNB.

53. The level of lending by PNB's peers demonstrates that there were thousands of qualified borrowers for home loans and sufficient mortgage loan demand in majority-Black and Hispanic neighborhoods in the Columbus Lending Area. PNB had no legitimate, non-discriminatory reason to originate so few home loans from these neighborhoods.

54. The data show a statistically significant failure by PNB, relative to its peer lenders,

---

[8] In this section, the terms "home loans," "mortgage loans," and "HMDA loans" are used interchangeably to refer to mortgage loans for 1-4 family, owner-occupied properties.

to make home loans and provide residential mortgage services to qualified applicants in majority-Black and Hispanic areas on a non-discriminatory basis during the Relevant Time Period.

### G. PNB's Inadequate Internal Fair Lending Monitoring

55. During the Relevant Time Period, PNB's internal fair lending oversight, policies, and procedures were inadequate to ensure that the Bank was positioned to provide equal access to credit to majority-Black and Hispanic neighborhoods in the Columbus Lending Area.

56. Park National Corporation adopted its enterprise-wide Fair and Responsible Policy in 2013. This Policy requires PNB to maintain a Fair and Responsible Program, consisting of a Fair Lending Risk Management Program ("Risk Management Program") and a Fair and Responsible Lending Program.

57. Although PNB has followed federal redlining enforcement actions for years, the Bank failed to establish a robust Risk Management Program during the Relevant Time Period and did not compare its lending performance in majority-minority census tracts to that of other institutions with a similar volume of lending activity in each of its market areas.

58. As a general matter, however, PNB was aware that it underperformed its self-designated peers in generating home loan applications from majority-minority census tracts. Reports produced by the Bank for each year showed that, between 2015 and 2020, 1.14% to 2.05% of PNB's overall mortgage loan applications came from "substantially minority" census tracts, while 5.03% to 12.07% of its self-designated peers' applications were from these census tracts.

59. PNB also tracked its mortgage loan applications and originations in majority-minority areas within the Columbus MSA for each year, and the data it collected consistently revealed substantial disparities between the Bank's lending activity and the demographics of the

MSA's neighborhoods. In its annual plans submitted to the Board of Directors, PNB's Fair and Responsible Program repeatedly listed "[i]mprove home lending production within Franklin County, Ohio" as one of its goals for the upcoming year.

60. PNB did not take effective action to improve its mortgage lending performance in Franklin County, particularly within majority-Black and Hispanic areas. When PNB purportedly attempted to take measures to meet the credit needs of its entire community, such as developing loan products for residents of low-income areas and, in one case, a majority-Black and Hispanic neighborhood, it either did not pair these efforts with sufficient funding and outreach for them to be successful or only originated a small number of loans. In fact, the data showing that PNB drew few of its applications and originated less than one percent of its mortgage loans in majority-Black and Hispanic census tracts demonstrates that, across the Relevant Time Period, the Bank failed to serve these portions of the Columbus Lending Area.

61. PNB's discriminatory conduct, policies, and practices as described herein have intended to discriminate and have had the effect of discriminating on the basis of race, color, and national origin.

## THE UNITED STATES' INVESTIGATION

62. On November 29, 2021, the United States notified PNB that it was opening an investigation into whether the Bank had engaged in unlawful redlining in violation of the FHA and ECOA. Through that investigation, the United States determined that PNB had committed the violations of the FHA and ECOA described herein.

## COUNT I – VIOLATIONS OF THE FAIR HOUSING ACT

63. The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

64. PNB's policies and practices constitute unlawful redlining of majority-Black and Hispanic communities in the Columbus Lending Area on account of the racial, color, or national origin composition of those communities.

65. Defendant Park National Bank's conduct as alleged herein constitutes:

    a. Discrimination on the basis of race, color, and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulations, 24 C.F.R. §§ 100.110(b), 100.120;

    b. The making unavailable or denial of dwellings to persons because of race, color, and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3); and

    c. Discrimination on the basis of race, color, and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65.

66. Defendant Park National Bank's policies and practices alleged herein constitute:

    a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

    b. A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance within the meaning of

42 U.S.C. § 3614(a).

67. PNB's discriminatory policies and practices have been intentional and willful and implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

68. Persons who have been victims of PNB's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i) and may have suffered damages as a result of the Bank's conduct in violation of the Fair Housing Act, as described above.

**COUNT II – VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT**

69. The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

70. Defendant Park National Bank's conduct, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic neighborhoods in the Columbus Lending Area and discouraging prospective applicants in majority-Black and Hispanic communities from applying for credit on the basis of race, color, or national origin in violation of the Equal Credit Opportunity Act and Regulation B. 15 U.S.C. § 1691 *et seq.*; 12 C.F.R. § 1002.4(a)–(b).

71. Defendant Park National Bank's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of the Act. 15 U.S.C. § 1691e(h).

72. PNB's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

73. Persons who have been victims of PNB's discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. §1691e(i) and may have suffered damages as a result of the Bank's conduct in violation of the Equal Credit Opportunity Act, as described above.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that the Court enter an order that:

(1) Declares that the conduct of Defendant Park National Bank violates the Fair Housing Act;

(2) Declares that the conduct of Defendant Park National Bank violates the Equal Credit Opportunity Act;

(3) Enjoins Defendant, its agents, employees, and successors, and all other persons in active concert or participation with Defendant, from:

    A. Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

    B. Discouraging applicants on account of race, color, or national origin;

    C. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

    D. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and provide policies and procedures to ensure all segments of Defendant's market areas are served without regard to prohibited characteristics;

(4) Awards monetary damages against Defendant in accordance with 42 U.S.C.

§ 3614(d)(1)(B) and 15 U.S.C. § 1691e(h);

(5) Assesses a civil penalty against Defendant in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6) Awards the United States any additional relief the interests of justice may require.

## DEMAND FOR JURY TRIAL

The United States demands trial by jury in this action on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 28, 2023

Respectfully submitted,

MERRICK B. GARLAND
Attorney General

KENNETH L. PARKER
United States Attorney
Southern District of Ohio

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SAMEENA SHINA MAJEED
Chief

*/s Andrew M. Malek*
ANDREW M. MALEK
Civil Chief
BRANDI M. STEWART
Deputy Civil Chief
MICHAEL J.T. DOWNEY
Assistant U.S. Attorney
United States Attorney's Office
Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Telephone: (614) 469-5715
Emails:
Andrew.Malek@usdoj.gov
Brandi.Stewart@usdoj.gov
Michael.Downey@usdoj.gov

*/s Jaclyn A Harris*
JON M. SEWARD
Principal Deputy Chief
JACLYN A. HARRIS
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 305-5944
Facsimile: (202) 514-1116
Email:
Jaclyn.Harris@usdoj.gov

Attorneys for Plaintiff
United States of America